IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

| | |
|---|---|
| BOHEMIAN HOME FOR THE AGED, )<br>An Illinois Not-For Profit Corporation, )<br>d/b/a TABOR HILLS SENIOR )<br>LIVING CAMPUS; )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>GLOBAL PORTFOLIO STRATEGIES, )<br>INC., a Connecticut Corporation, n/k/a )<br>EMPOWER RETIREMENT, LLC, )<br>a Colorado Limited Liability Company )<br>)<br>Defendants. ) | Case No.: 24-CV-5246 |

## COMPLAINT

NOW COMES the Plaintiff, BOHEMIAN HOME FOR THE AGED doing business as TABOR HILLS SENIOR LIVING CAMPUS, by and through their undersigned Counsel at JD Law LLC and Stoltmann Law Offices, P.C. and for their Complaint against the above-named Defendants, respectfully state as follows:

### Nature of the Case

1. Plaintiff was the Sponsor and Plan Fiduciary, as defined by the Employee Retirement Income Security Act (hereafter "ERISA") at 29 U.S.C. § 1002(16) and 29 U.S.C. § 1002(21)(A)(i), of the Bohemian Home for the Aged Defined Benefit Pension Plan (the "Plan"). The Plan was a defined benefit plan subject to ERISA at all times relevant, until the Plan termination in August 2022.

2. This matter arises from the tortious investment advice in June 2021 by Defendant Global Portfolio Strategies, Inc. to concentrate virtually 100% of Plaintiff's defined benefit pension plan in two proprietary long-term bond funds.

3. Defendant Global Portfolio Strategies, Inc., contracted with Plaintiff in 2010 to provide investment advice and ERISA fiduciary services to the Plan and to Plaintiff. Defendant's advice in June 2021 to concentrate the entire Fund in long-term bond funds, when the Pension had already decided to terminate within one year, was reckless. This action arises as a result.

## Parties

4. Bohemian Home for the Aged is an Illinois not-for-profit Corporation, and is a resident and citizen of the State of Illinois. Plaintiff is headquartered in Naperville, Illinois and operates a fifty-two acre senior living facility in Naperville, Illinois.

5. Global Portfolio Strategies, Inc. ("GPSI") was a Corporation and citizen of the State of Connecticut. GPSI was headquartered in Hartford, Connecticut. GPSI was a wholly owned subsidiary of Prudential Retirement Insurance and Annuity Company ("PRIAC"). On April 1, 2022, Prudential Financial, Inc., sold PRIAC, GPSI, and other subsidiaries to Great West Life Annuity Company's United States subsidiary, Empower Retirement, LLC, for $2.8 billion. At all times relevant, GPSI was a Registered Investment Adviser Firm, CRD # 105812; SEC # 801-16664. At all times relevant, GPSI was categorized as a "Large Advisory Firm" with the Securities and Exchange Commission and was licensed in all fifty states and Puerto Rico.

6. Empower Retirement, LLC, is a Colorado Limited Liability Company, headquartered in Greenwood Village, Colorado. Empower Retirement, LLC, is a resident of the State of Colorado.

## Jurisdiction and Venue

7. This Court has jurisdiction over the subject matter herein pursuant to ERISA § 502(e)(2), 29 U.S.C. §1132(e)(2), and 28 U.S.C. §1331.

8. Venue is proper in this district pursuant to 28 U.S.C. §1391 because a substantial part of the events, omissions, actions and transactions at issue occurred within the Northern District of Illinois.

9. This Court has personal jurisdiction over the Defendants named herein pursuant to 735 ILCS 5/2-209 in that the claims asserted herein, as more specifically set forth below in the allegations of fact and counts of the Complaint, arise from:

    a. Defendants' transaction of business within Illinois (§2-209(a)(1));

    b. Defendants' committing tortious acts of breach of fiduciary duty within Illinois (§2-209(a)(2));

    c. Defendants' violations of statutes within Illinois (§2-209(a)(4));

    d. The making or performance of contracts substantially connected with a citizen of Illinois (§2-209(a)(7));

    e. Breaches of fiduciary duty within Illinois (§2-209(a)(11)); and,

    f. Defendants' otherwise sufficient minimal contacts with Illinois such that the exercise of personal jurisdiction does not offend traditional notions of fair play and substantial justice (§2-209(c)).

**Common Allegations of Fact**

*<u>The Retirement Plan for the Bohemian Home for the Aged</u>*

10. Bohemian Home for the Aged was founded in 1894 as an orphanage and home for seniors. Tabor Hills is the brand name for the senior living campus which is comprised of a fifty-two acre senior living facility in Naperville, Illinois. The facility operates independent senior living patio homes, a supportive living community, which is owned by Tabor Hills Supportive Community, LLC, an Illinois LLC, and a skilled nursing facility owned and operated by Tabor Hills Healthcare Facility, Inc., an Illinois not-for-profit corporation.

11. Bohemian Home for the Aged is the sole member of Tabor Hills Supportive Living Community, LLC, and Tabor Hills Health Care Facility, Inc. Hereinafter, Plaintiff is referred to as "Tabor Hills".

12. The Retirement Plan for Employees of Bohemian Home for the Aged (the "Plan") was a defined benefit pension plan founded in 1974 to provide qualified employees with retirement benefits. Plaintiff was at all times relevant the Plan Sponsor and Named Plan Fiduciary, as defined by ERISA.

13. At all times, the Plan was a "Defined Benefit Plan" within the meaning of ERISA because, among other things, it provided for a defined monthly benefit at retirement for its beneficiaries, and its benefits were at least partially protected by federal insurance provided through the Pension Benefit Guaranty Corporation (PBGC).

*Tabor Hills Hires PRIAC and GPSI to Provide Various Fiduciary Services to the Plan*

14. The Plan Documents, as amended, provided Tabor Hills with the express authority to retain competent and qualified agents to further the ends of the Plan. Specifically, Article XIV-Administration, Section 14.1, Authority of the Sponsor, specifically authorized Tabor Hills to:

> a. Allocate any of the powers, authority, or responsibilities for the operation and administration of the Plan (other than trustee responsibilities as defined in ERISA Section 405(c)(3)) among named fiduciaries.

15. Further, ERISA § 405(c), 29 U.S.C. § 1105(c), expressly provides that the named fiduciary can appoint an investment manager to allocate trustee responsibility to an investment manager.

16. On May 1, 2010, Plaintiff retained PRIAC to provide the Plan with a series of services, including:

    a. Actuarial Valuation & Recordkeeping

    b. Form 5500 Preparation

    c. Plan Document Preparation

    d. Employee Booklet (SPD) Preparation

    e. Employee Communications

    f. Benefit Calculation Services

    g. Benefit Payment Services (Payment and Claim)

    h. Professional Consulting Services and

    i. Trustee Services (provided by Prudential Bank & Trust, FSB).

17. At the same time, Plaintiff, on behalf of the Plan, contracted with GPSI through a Letter Agreement, specifically related to Plan asset allocation services. The Letter Agreement provides that:

    a. GPSI would "provide advice as to the allocation of funds by classes of investments for the Retirement Plan for Employees of Bohemian for the Aged." (Ltr. Ag. At pg. 1);

    b. GPSI would "be responsible for any investment advice it may render to the extent that such advice is adhered to" by Bohemian Home for the Aged (Ltr. Ag. ¶¶1 - 2);

    c. GPSI accepted "those fiduciary responsibilities with respect to obligations, undertakings and determinations made by it in connection with establishing the Plan's asset allocation strategy" (Ltr. Ag. ¶ 6);

    d. GPSI agreed "to discharge such duties and responsibilities as a fiduciary in the sole interest of the plan participants and their beneficiaries and in accordance with the requirements of the Employee Retirement Income Security Act of 1974" (Ltr. Ag. ¶ 6); and,

    e. "in discharging such duties and responsibilities [GPSI] is a fiduciary as that term is defined in the Employee Retirement Income Security Act of 1974."

18. Section 6 of the Letter Agreement makes it clear that GPSI contracted to be an ERISA named Fiduciary. Likewise, Section 1 clarifies that GPSI is responsible for allocation decisions adhered to by the Named Plan Fiduciary.

*Tabor Hills Contracts with Defendant for Plan Termination Services*

19. On March 29, 2021, Plaintiff and PRIAC entered into an "Agreement to Provide Pension Plan Termination Services." Just prior to that, on March 11, 2021, Plaintiff and PRIAC entered into an engagement letter for a "Small Benefit Cashout Project." PRIAC was paid $137,000 for providing plan termination services to the Plaintiff, plus another $4,000 for the small benefit cashout.

20. On June 9, 2021, the Plaintiff, through PRIAC, amended the Retirement Plan to add a Termination Amendment, making plan termination official.

21. Under ERISA, 29 U.S.C. §§ 1362 and 1363, as a Plan Sponsor of the Plan, Tabor Hills was liable for any deficit in plan funds needed to pay guaranteed benefits following plan termination.

22. Tabor Hills decided to terminate the Plan and instead transition to offering employees defined contribution individual 401K plans.

23. Once Plan Termination became official, the Plan effectively had one year left in existence before benefits would be paid out, fully calculated, and any liabilities owed by Tabor Hills to cover Plan deficits would be paid.

24. The Plan had a funding gap or unfunded liability, which is not unusual for defined benefit plans of this nature. Once Plan Termination was set in motion by Tabor Hills and PRIAC, it became of the utmost importance to Tabor Hills to minimize that funding gap responsibly, if possible.

25. GPSI, as the investment adviser and fiduciary to the Plan, was responsible for "de-risking" the Plan portfolio now that plan termination was set.

26. GPSI acted based on the plan termination. Beginning in the first quarter of 2021, GPSI began shifting every dollar the Plan had invested in equities and most of the money invested in an aggregate bond fund, into two long-duration bond funds. Previously, the account was invested in twelve funds/managed accounts, and that was reduced to three, with about 80% of all assets in the two long-term bond funds.

27. After the Plan termination became a certainty, GPSI further over-concentrated the Plan assets by selling the remaining assets in any equity fund, selling more of the aggregate bond fund, and investing those proceeds into one long-duration bond fund. By the end of June 2021, 99.03% of the Plan was invested in two long-term/long-duration bond funds. The Plan was now entirely exposed to the risk associated with investing in long-term bonds for the short-term: interest rate risk.

28. In June 2022, GPSI liquidated the long-term bond positions, realizing $1,542,191 in investment losses to the Plan in just two quarters. This represented over 13% of the Plan assets. Because Plan assets decreased so substantially just prior to Plan Termination, Tabor Hills's funding liability increased dramatically. Tabor Hills paid $2,105,005 to the PBGC to cover Plan liabilities. Had GPSI invested the Plan prudently, with an eye towards de-risking Plan assets in the face of Plan Termination, then Tabor Hills would have only owed approximately $600,000 in plan termination liability.

<em>Investment Risk of Long-Term Bonds</em>

29. Bonds are fixed income debt securities issued by companies and municipalities to raise money. In exchange for a principal investment, the issuer agrees contractually to pay a certain rate of interest over a specific period of time, with a promise to repay the entire principal investment at the maturity date. Bonds come in innumerable forms, with broad ranges of maturities ranging from very short term (weeks) to very long term (30 plus years).

30. Similarly, bonds come with wide ranging coupon rates, typically based on the risk assigned to the bond. Generally, the higher the interest the coupon payment is, the higher the risk of the bond. Because holding a long-term bond is a riskier bet that the company or municipality will be able to make its payments over a longer period of time, long-term bonds tend to have higher interest rates.

31. The primary risk to bond investors is the risk of default, which occurs when an issuer fails to make interest or principal payments as promised. Another risk to bond holders, which is specific to each issuer, is whether the bond is callable prior to maturity. This risk accounts for an investor's plan when investing in a bond, which is to receive the set interest payments for a specified number of months and years, and then having the bond called, with the investor receiving their principal back sooner than expected.

32. Most bonds are tradeable on the open market and will usually trade at some discount or premium to "par". For example, if a bond is issued at $100, it may trade on the open market for $97 or $103.

33. The market value of a bond is correlated to the market interest rate. When broader interest rates, like the Fed Rate, drop, the value of existing fixed-rate bonds will increase. Conversely, if interest rates increase, the value of existing bonds will plummet. Selling long-term bonds in this market environment will result in realized losses.

34. The Fed Funds Rate – the interest rate which banks pay each other for overnight lending – is influenced substantially by the "target rate" set by the Federal Reserve Open Market Committee.

35. In reaction to the COVID-19 pandemic and the exceptional impacts on the economy resulting therefrom, the Fed Target Rate reached 0.25% in March 2020 - which is the lowest this rate has reached historically. For many years after the financial crisis of 2008, the Target Rate was set at this

historically low 0.25% rate, before increasing incrementally beginning in December 2015 through May 2019 topping out at 2.5%.

36. What differentiates the interest rate environment of the financial crisis time period and the rate environment in 2020 and 2021, is the specter of inflation. Persistently low interest rates, combined with massive amounts of government spending in reaction to the COVID-19 pandemic, supply-chain disruptions, and a strong labor market, led to ever-increasing consumer prices and inflation.

37. According to the Bureau of Labor Statistics, as measured by the 12-month percentage change in consumer prices, inflation rates were as follows:

a. March 2021 – 1.6%
b. April 2021 – 3.0%
c. May 2021 – 3.8%
d. June 2021 – 4.5%
e. July 2021 – 4.3%
f. August 2021 - 4.0%
g. September 2021 – 4.0%
h. October 2021 – 4.6%
i. November 2021 – 4.9%
j. December 2021 – 5.5%
k. January 2022 – 6.0%
l. February 2022 – 6.4%
m. March 2022 – 6.5%
n. April 2022 – 6.2%
o. May 2022 – 6.0%
p. June 2022 – 5.9%
q. July 2022 – 5.9%
r. August 2022 – 6.3%
s. September 2022 – 6.6%

38. To tame inflation, the Federal Reserve Open Market Committee (FOMC) began to raise its Fed Funds Target Rate in March 2022, and raised rates continuously through August 2023, reaching a target rate of 5.5%.

39. The metric used to measure inflation is the Consumer Price Index, calculated by the Federal Reserve and published monthly. In March 2021, the Consumer Price Index (CPI) was 264.91. It increased at a historically high rate throughout 2021 and 2022:

  a. April 2021- 266.75
  b. May 2021- 268.45
  c. June 2021 – 270.66
  d. July 2021 – 271.99
  e. August 2021 – 272.78
  f. September 2021 – 273.88
  g. October 2021 – 276.43
  h. November 2021 – 278.79
  i. December 2021 – 280.80
  j. January 2022 – 282.39
  k. February 2022 – 284.53
  l. March 2022 – 287.55
  m. April 2022 – 288.76
  n. May 2022 – 291.35
  o. June 2022 – 294.97

40. From April 2021 to June 2022, the Consumer Price Index increased over 10%, another very clear indication that inflation was happening in a very real way.

*The Inflation and Interest Rate Risk Was Well-Covered Throughout 2021*

41. GPSI had ample information and time to react to the changing bond market throughout 2021 and into 2022.

42. As early as February 2021, major media publications began to warn about inflation risk and the rise in interest rates that will be required to combat it.

43. On March 10 2021, the Wall Street Journal published an article titled "Third COVID-19 Stimulus Package Could Jolt U.S. Growth, Revive Inflation in 2021" which quoted Larry Summers, former U.S. Treasury Secretary, stating: "There's a real possibility that within a year, we're going to be dealing with the most serious incipient inflation problem that we have faced in the last 40 years."

44. A month later, on April 11, 2021, the New York Times published an article titled "Staying Afloat As Interest Rates Rise." The article said "But with the economy taking off, rates have begun to rise. At the start of a new quarter, is it a good moment to ask, how long can these strangely prosperous times last?"

45. On April 11, 2021, The Wall Street Journal published an article titled "With Economy Poised for Best Growth Since 1983, Inflation Lurks." The article predicted that inflation would rise to 3% by June 2021, and that the Federal Reserve would raise interest rates six months earlier than previously forecasted, by mid-2023, not 2024.

46. On April 13, 2021, The Wall Street Journal published an article titled "Inflation Accelerated in March Due to Strengthening Economy, Rising Energy Prices." The article reported "U.S. consumer prices rose sharply in March…" The article, which surveyed economists on the issues, further stated "Some economists, however, see rising risks that inflation could accelerate more than Fed officials expect, forcing them to raise interest rates sooner than anticipated to cool price pressures."

47. On May 4, 2021, the New York Times published an article titled "Yellen Says Rates Might Need to Rise as Economy Recovers". The first sentence of the article says "Treasury Secretary Janet L. Yellen said higher interest rates might be needed to keep the economy from overheating given the large investments that the Biden administration is proposing to rebuild the nation's infrastructure and remake its labor force." The article also reports the "heightened concern from some economists and businesses that the United States is in for a period of higher inflation…".

48. In May 2021, broker-dealer and investment adviser Edward Jones published a market insight titled "3 Takeaways on Rising Long-Term Interest Rates." The market insight states, "Longer-term rates have risen amid evidence of strong growth and the prospects of high inflation, pressuring bond returns."

Edward Jones also reminded investors that "longer-term bonds typically provide higher yields, they also come with greater interest rate risk."

49. On June 16, 2021, The New York Times reported that "Federal Reserve Officials Project Rate Increases in 2023." This article references the Fed's first actual indication that raising rates was in the cards, and that if inflationary pressures come in higher than expected, that the Fed would not hesitate to act.

50. There was ample information available to all investment adviser professionals like GPSI, that the risk of rising interest rates was real and was already happening in the first half of 2021, *before* the Plan formally entered Plan Termination.

51. Since Plan Termination formally started in June 2021, the most pressing risk to the Plan and to Tabor Hills – who would be liable for any shortfall – was realizing investment losses in the next year. GPSI was well aware of the short-term risk, the pending shortfall owed by Tabor Hills which it estimated for Tabor Hills on a regular basis, and that any investment losses to the Plan would serve to increase the liability that Tabor Hills would be required to cover.

52. Instead of de-risking the Plan, GPSI concentrated virtually the entire Plan in two long-duration bond funds in June 2021.

53. As 2021 continued, so did the building chorus of warnings about inflation and interest rates, including the following reports:

    a. The Wall Street Journal, July 11, 2021: "Higher Inflation Is Here to Stay for Years, Economists Forecast."

    b. The New York Times, August 4, 2021: "A Top Fed Official Says Rate Increases Could be Warranted in 2023."

c. The Wall Street Journal, August 11, 2021: "Inflation Stayed High in July as Economy Rebounded." The article states, "Consumer prices rose 5.4% from year earlier."

d. The Wall Street Journal, August 23, 2021: "Fed Chairman Powell Navigates the Inflation Debate."

e. The Wall Street Journal, October 13, 2021: "Fed Worried About Inflation Risk as It Firms Up Tapering Plan." The article references the "raising risks of more persistent inflation."

f. The Wall Street Journal, October 15, 2021: "Inflation Surges Worldwide as Covid-19 Lockdowns End and Supply Chains Can't Cope."

g. The Wall Street Journal, October 19, 2021: "Waller: Inflation Doesn't Cool by Year-End, Fed Could Bring Rate Increases Forward."

h. The Wall Street Journal, December 2, 2021: "Randal Quarles Says Fed Will Need to Raise Rates to Cool Inflation." "Top Federal Reserve Official said it was time for the central bank to prepare to raise interest rates because inflation was likely to stay above the Fed's 2% target for longer than anticipated."

i. Fox Business, December 15, 2021: "Fed Eyes Up to 3 Interest Rate Hikes in 2022 to Address High Inflation, citing Federal Open Market Committee minutes."

54. Inflation and rising interest rates were clearly reported throughout 2021. Investing the entire Plan into long-term bonds in an ever-increasingly risky manner was imprudent and reckless given the needs of the Plan and Tabor Hills due to pending Plan Termination. Instead of de-risking the Plan due to the pending Termination, and investing the Plan in short-term bond and cash positions, GPSI put all of the Plan's eggs in one, high risk basket.

*Defendant's Duties*.

55. ERISA defines a fiduciary as someone who "(i) exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) has any discretionary authority or discretionary responsibility in the administration of such plans." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

56. People and entities are fiduciaries pursuant to ERISA not only when they are named as fiduciaries under ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also when they perform such fiduciary functions.

57. Investment managers are also ERISA fiduciaries. ERISA defines in relevant part an "investment manager" as one who: "has the power to manage, acquire, or dispose of any asset of the plan"; is "registered as an investment adviser"; is a bank; or has acknowledged in writing that he or she is a fiduciary with respect to the plan. ERISA § 3(38), 29 U.S.C. § 1002(38).

58. ERISA mandates that fiduciaries operate with an "eye single" to the interests of plan participants and beneficiaries. *See, e.g.*, *John Blair Communications, Inc. Profit Sharing Plan v. Telemundo Group, Inc. Profit Sharing Plan*, 26 F.3d 360, 367 (2d Cir. 1994). ERISA's fiduciary duties are, of course, "the highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.2 (2d Cir. 1982).

59. At all times, Defendant served as Investment Adviser, Investment Manager, and Trustee of the Plan. Defendant was a fiduciary to the Plan who made investment recommendations to Tabor Hills, who in turn relied on this advice. Defendant was contractually bound to Tabor Hills and the Plan as an ERISA fiduciary.

60. One critical aspect of ERISA's duty of prudence is the duty to diversify the Plan assets. ERISA requires that a fiduciary "diversify the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so." 29 U.S.C. § 1104(a)(C). Defendant was at all times aware of and cognizant of its fiduciary duties owed to the Plan.

61. Under ERISA, a "fiduciary must discharge his responsibilities 'with the care, skill, prudence, and diligence' that a prudent person 'acting in a like capacity and familiar with such matters' would use." *Tibble v. Edison Int'l,* 135 S.Ct. 1823, 1828 (2015) (quoting § 1104(a)(1)).

62. ERISA requires that a fiduciary "diversify the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so." 29 U.S.C. § 1104(a)(C). The duty to diversify requires, among other things, diversity not only among specific securities but also among industries or sectors. *In re Unisys Savings Plan Litig.*, 764 F.3d 420, 438 (3d. Cir. 1996).

63. ERISA's legislative history provides that a fiduciary should consider several factors, including "(1) the purposes of the plan; (2) the amount of the plan assets; (3) financial and industrial conditions; (4) the type of investment, whether mortgages, bonds or shares or otherwise; (5) distribution as to geographical location; (6) distribution as to industries; [and], (7) the dates of maturity." H.R. Rep. No. 1280, 93d Cong., 2d Sess. (1974), reprinted in 1974 U.S.C.C.A.N. 5038, 5084-585; *see also In re Unisys Sav. Plan Litigation,* 74 F.3d 420, 438 (3rd Cir. 1996).

64. Moreover, "a fiduciary has a continuing duty of some kind to monitor investments and remove imprudent ones." *Tibble v. Edison Intern.*, 575 U.S. 523 (2015).

65. Indeed, a fiduciary should not invest the "whole or unduly large portion of the trust property in one type of security or in various types of securities dependent upon the success of one enterprise … since the effect is to increase the risk of large losses." H.R. Rep. No. 1280, 93d Cong., 2d Sess. (1974),

reprinted in 1974 U.S.C.C.A.N. 5038, 5084-585; *see also In re Unisys Sav. Plan Litigation,* 74 F.3d 420, 438 (3rd Cir. 1996)

66. Thus, a fiduciary must invest the Plan in a manner sufficient to account for the Plan's cash flow needs and in connection with Plan Termination.

67. Defendant breached their fiduciary duties by failing to diversify the Plan's asset allocation and by investing nearly 100% in long-term bonds despite having knowledge of the Plan Termination.

### *The Tolling Agreement Between the Parties*

68. On January 15, 2024, the parties herein entered into a Tolling Agreement in order to toll the relevant statute of limitations while the parties attempted to mediate this matter. Pursuant to the Tolling Agreement, the parties agreed to toll the statute of limitations between January 15, 2024 and June 1, 2024.

69. Plaintiff did not, and could not, discover the losses herein and the damage caused by Defendant's breaches of duties until the plan was terminated in August of 2022 and Plaintiff was required to pay the shortfall of $2,105,005 to the PBGC to cover Plan liabilities.

70. A report prepared by Prudential in September of 2021 indicated that the Plan was fully funded at a rate of 103%.

### COUNT I
### Violation of ERISA §§404(a)(1)(B) and (C)
### Breach of Duties of Prudence and Diversification

71. Plaintiff realleges and incorporates by reference paragraphs 1 through 70 as if fully set forth herein.

72. Defendant was a fiduciary for the Plan.

73. A fiduciary must comply with the duty of prudence, which includes, *inter alia*, the duty to diversify and to monitor and remove improper investments. In carrying out these duties, fiduciaries must comply with the care, skill, prudence, and diligence of a prudent person under the circumstances then prevailing.

74. The U.S. Department of Labor ("DOL") and case law have interpreted this duty. In order to comply with the duty of prudence, a fiduciary must give appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role that the investment of investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties. 29 C.F.R. §2550.404a-1(b)(1).

75. Appropriate consideration, according to DOL regulations, includes but is not necessarily limited to: (i) a determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associates with the investment or investment course of action; and (ii) consideration of the following factors: (A) the composition of the portfolio with regard to diversification, (B) the liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and (C) the projected return of the portfolio relative to the funding objectives of the plan. 29 C.F.R. §2550.404a-1(b)(2).

76. Defendant's conduct with respect to the Plan violated in numerous ways its fiduciary duties of prudence and diversification as alleged above.

77. Defendant's actions directly and proximately caused substantial financial harm to Plaintiff. As a result of this wrongdoing, Defendant is liable for all resulting loss and damage, including reasonable attorney fees incurred by Plaintiff herein pursuant to 11 USCA §1132(g).

WHEREFORE, Plaintiff prays the Court enter an Order of Judgment in favor of Plaintiff and against Defendant and award compensatory damages, reasonable attorney fees, and any and all statutory relief under ERISA that this Court deems just and equitable.

## Count II

### Indemnification

78. Plaintiff realleges and incorporates by reference paragraphs 1 through 70 as if fully set forth herein.

79. ERISA Section 409(a) imposes personal liability upon fiduciaries for any and all fiduciary breaches.

80. Defendant breached their fiduciary duties by failing to properly diversify the Plan and failing to de-risk the Plan during the process of terminating the Plan.

81. GPSI has a contractual agreement with Plaintiff to properly allocate plan assets as a fiduciary.

82. As a result of Defendant's breaches of duties, in August of 2022, Plaintiff was required to pay a shortfall of $2,105,005 to the PBGC to cover Plan liabilities.

83. Had GPSI invested the Plan prudently, with an eye towards de-risking Plan assets in the face of Plan Termination, then Tabor Hills would have only owed approximately $600,000 in plan termination liability.

84. This excessive shortfall naturally arose from the breach of duties and was reasonably within the contemplation of the parties as a probable result of the breach.

85. Indemnity is justified under the circumstances.

WHEREFORE, Plaintiff prays the Court enter an Order of Judgment in favor of Plaintiff and against Defendant and award compensatory damages to indemnify Plaintiff for the losses sustained herein and any and all other relief this Court deems just and equitable.

    Respectfully submitted,

    BOHEMIAN HOME FOR THE AGED

    /s/ Jordan B. Dorrestein
    One of Plaintiff's Attorneys

Jordan B. Dorrestein (IL Atty. No. 6308902)
JD Law, LLC
405 Illinois Ave. Ste 2A
Sr. Charles, IL 60174
P: (630)425-6510
jordan@jdlawllc.com

Andrew Stoltmann, Esq.
Joseph Wojciechowski, Esq.
Michael Mungovan, Esq.
STOLTMANN LAW OFFICES, P.C.
2000 Center Drive, Suite East C218
Hoffman Estate, Illinois 60192
PH: (312) 332-4200
joe@stoltlaw.com
andrew@stoltlaw.com